RAMÍREZ ET AL., PLAINTIFFS AND APPELLANTS, v. RAMÍREZ ET AL., DEFENDANTS AND APPELLEES.

APPEAL from the District Court of Mayagüez in an Action of Filiation, Etc.

No. 2267.—Decided May 31, 1922.

FILIATION—NATURAL CHILD—ACKNOWLEDGMENT—CONCUBINAGE.—The 11th Law of Toro does not distinguish between natural children and includes those born in concubinage; nor does that law assume that a child born of parents living together publicly as husband and wife has an established legal status without the necessity of an action of filiation.

ID.—ID.—ID.—PRESCRIPTION.—In so far as the plaintiff bases her right to acknowledgment on public concubinage, she had no legal civil status, and with regard to any right that she had by reason of the legislation in force prior to 1911, her action of filiation has prescribed.

The facts are stated in the opinion.

*Mr. L. Llorens* for the appellants.

*Messrs. Travieso & Iriarte* and *B. Forés* for the appellees.

MR. JUSTICE WOLF delivered the opinion of the court.

María Ramírez de Riera was born in 1868 and as a natural child brought an action for filiation against defendants as heirs of the alleged putative father. The court below sustained a demurrer on the ground of prescription in accordance with the various decisions of this court and which are set forth in *Castro v. Solís,* 19 P. R. R. 645; *Castro v. Solís,* 23 P. R. R. 483. The appellant, however, in an able presentation of the historical conditions existing at the time of the enactment of the 11th law of Toro, attempts to draw a distinction between natural children and maintains that a natural child whose parents lived in open concubinage never needed to establish an action of filiation, but that such a child had a status similar to that of a legitimate child. It was, according to appellant, only when a child was born secretly and the concubinage was not public that an action of filiation was necessary to establish a status and hence, argues the appellant, the enactment of the 11th law of Toro as follows:

"And so that there may be no doubt as to who are natural children, it is ordered and decreed that natural children shall be deemed to be those whose parents at the time of their birth or conception were in a position to marry without dispensation; provided that the father acknowledged the child as his own and that the mother did not live in his home and was not the only woman. When the foregoing elements concur, it is ordered that the child shall be considered a natural child."

It is well to draw attention to two points; first, that the law transcribed does not speak of concubinage as giving a right to acknowledgment, but on the other hand neither does that law assume necessarily that a child born of parents living together publicly as man and wife has an established legal status without the necessity of a suit for filiation. The appellant proceeds to discuss the condition of affairs at the time of *Las Siete Partidas* and the legislation theretofore. There was no doubt that at that time and prior thereto a child who could show that his parents were living together in public concubinage was a natural child, and as such, had claims on his father, but that such a child had a legal civil status established does not necessarily follow. The 11th law of Toro, we may repeat, said that certain steps were necessary to acquire a legal civil status, and even granting that the said law refers only to children born out of a man's house, it does not follow that no legal steps were necessary to establish a status for the children born of parents living in public concubinage before that time.

The appellant cites a number of textwriters which she maintains show that a child born of parents living together in public concubinage was a natural child and had without further acknowledgment all the rights of natural children. Some of the more germane citations are from Arrazola (page 637, vol. 5 of his Encyclopaedia):

"In order the better to understand how favorably the right to live in concubinage was considered and the character given thereto, it will suffice to cite certain provisions made in regard to the fruit

of such unions. In the first place, the filiation of such children was indisputable; the mere fact that they were born of a woman who was joined to a man by ties recognized at law and presupposing mutual fidelity established the paternity of the latter; if the solemn ties of matrimony identified the father of the children born thereunder, so the state of concubinage (*barraganía*) also showed who was the father of the natural children, or children of the '*ganancia*,' as termed at law.

"With this exception the legal relations existing between the parents and the children begotten in concubinage were defined thus, the former were liable for damages caused by the acts of the latter in the same manner as in the case of a marriage duly solemnized.

"On the other hand, under the ordinances as well as the general laws of Castilla, children begotten in concubinage were assured the right, subject to certain limitations, to inherit from their father and relatives. In short, concubinage was regarded so favorably by the laws that when the father of children so conceived was of rank, such children could succeed to the privileges of such rank.

"And, in effect, formalities were in vogue to accredit a state of concubinage and to distinguish it from that of holy matrimony; it was reduced to a civil contract; and as such it was shown, as such it was proved; the ordinary way, especially in a contract of this kind, which involved divers elements, would undoubtedly be the execution of a writing before witnesses, whose participation as 'good men' (*homes bonos*) was of great importance and is alluded to as a *modus probandi*. At times the function of witnesses was regarded as so important that upon it depended whether a union was held to be a concubinage or lawful marriage in the absence of other means of proof. This is all we can say as to the means of contracting and proving concubinage; it was a kind of conjugal association without the intervention of the Church, the means of proof being therefore necessarily purely civil. Nevertheless, the formation of such unions was not frowned upon; they were quite frequent and general; they were authorized, recorded and governed by the laws; they were not considered indecorous, provided that the legal restrictions were observed and the legal formalities complied with; public opinion went hand in glove with legislation in this regard, and concubinage left no stain on the character of those who contracted and followed it.

"But not everybody could enter lawfully into concubinage, the law imposed certain restrictions based upon ties previously contracted, social considerations, or, in short, due deference to moral principles and public welfare. He who was united in lawful matrimony could

not publicly enter into a state of concubinage. Far from allowing such a scandalous union the ordinances and old laws of Spain held it in utter detestation and regarded it as a crime calling for severe bodily punishment; in some ordinances it was provided that if any married man kept a concubine, they should both be 'tied and flagellated' and the laws of the *Partida* bar all who are 'joined in matrimony' from keeping a concubine, a provision manifestly in keeping with the one inserted many centuries before in the '*Concilio de Toledo*,' of which we have already spoken."

From this citation it is evident that the natural child described had some rights, but we do not find it stated that he had a right to go into court for a declaration of heirship without filing a suit. We do not find that his legal civil status was established without the intervention of the public authorities. If some such step was not necessary, how was it possible to distinguish between a man who had more than one concubine or whose apparent concubinage was invalidated by an existing legal marriage? Could it be that the legitimate heirs of a person, born perhaps of a previous legitimate marriage, would be said to prove that an alleged concubinage was not of a licit order?

We have no indication, moreover, that these natural children formed a part of the legal succession of a man. The Romans themselves recognized no such civil legal relation. For example, in Sohm's Institutes of Roman Law, it is said:

"Concubinatus was the name applied to certain quasi-matrimonial relations which, though involving some legal disabilities, were nevertheless acknowledged by the legislation of the Empire (since Augustus) as constituting likewise a mode of lawful union between a man and a woman for the purpose of permanent mutual companionship. A concubine, however, was not called *uxor*, nor did she share the rank and position of the man. Nor again did the offspring of such a union (technically called '*liberi naturales*') fall under the *patria potestas* of their father. A man who was married could not have a concubine at the same time. For concubinage, like full marriage, was in its nature monogamous, and was therefore incompatible with any other relation of a similar character."

On the other hand two textwriters have a very different view. See La Serna in his commentaries on the law of Toro, page 514, as follows:

"Natural sons are those born of parents who at the time of the former's conception or birth were in a position to marry without dispensation, provided the father recognized them as his own, although the mother never lived at his home and was not the only woman. This provision of the laws of Toro considerably changed the doctrine established by the *Partidas*."

And Benito Gutiérrez in his work on Spanish Civil Law, volume 1, page 585, edition of 1868, referring to the law of Toro, says:

"Nor is it necessary, according thereto, that the concubine should live at home or be the only woman. I do not know what doubts this phrase may have suggested, when unless so understood its grammatical construction would convey no meaning; taken in connection with the antecedent words and construing it as conditional, as some claim, the resultant version is the following: Provided the father recognizes it as his child; provided he has kept the woman who gave birth to it at his home, is not even Spanish and besides being a grammatical error, such interpretation would result in a juridical absurdity; the Law of Toro is corrective of the *Partidas;* there it was not necessary to acknowledge the child of the concubine which was taken into the family with the consent of the members and even with formalities; at the present time acknowledgment is indispensable because concubinage of all kind is a clandestine union; but both elements could not well be harmonized, seeing that if in any case the acknowledgment could be condoned it must be where the man keeps the woman who bore his child at his home. To harmonize the clause with the subsequent words is also impossible. If it be insisted that the clause is affirmative instead of negative, its meaning is contradictory, and it is enigmatic. Provided he has kept the woman at his home and she is not the only woman, is what follows and this is an absurdity. It would have been an absurdity to impose conditions in connection with a state of concubinage which could not now exist since society rejects it; relegating such unions to the realms of vice, the law could not regulate it, it could not provide that only one woman should live in vice with a man, and not only should it not impose that condition but it is charged with the duty

of preventing his keeping her scandalously at his home. It is to be noted that even under the law of *Partidas* which authorizes this kind of sworn contract, the quality of common habitation required by the civil law was not of the essence of the contract, since, as stated by Gregorio López in Commentary 7, Title XV, if the children of a concubine whom the father did not keep at his home were not natural children when the concubine had intercourse with other men besides the man who kept her, it is clear that in the contrary event, that is, if she were faithful to him, the children might be natural even though the women lived in separate abodes.

"The most serious provision is that referring to the acknowledgment: the difficulties that can arise from this act are diverse. Must the acknowledgment be voluntary or may it be obligatory? Must it be express or may it be implied? In No. 129 Llamas says 'This was not one of the requirements of the Roman Law, nor was it necessary, since the concubine living at the home of her paramour the presumption existed that the latter was the father. As the Law of Toro extended the benefit of the natural status to the children of women who did not live in the house of the father, the presumption ceased and in its place it became necessary to provide for acknowledgment by the father.' So that, according to this writer, even now when the woman inhabits the house of the father, the acknowledgment would not be taken as established. Does the law authorize such presumption? In no wise; although there are many learned textwriters who assert the contrary, as may be seen in Gómez No. 2 of the commentaries, it appears to us that such presumption is too propitious and cannot and should not be admitted at law. Such presumption exists in a case of marriage, but is there any comparison between a solemn tie and an informal union, between the sanctity of the duties of a good wife and the freedom of life and customs of a mistress? Acknowledgment is always indispensable: whether it must be voluntary or whether it can be exacted by force need not be discussed here, since we reserve this question intact for consideration hereafter. It must be remembered, however, that if concubinage is a free act, the consequences of paternity may be enforceable; actions for rape are continually arising and once the crime is proved, and children are born as a result, the court orders the criminal to acknowledge the same as his own, including such acknowledgment in its judgment.

"Further, the law does not require and never has required that the acknowledgment should be express; it is sufficient that it be presumed. We know the danger of such presumptions, the frailty

of the methods even of those which are apparently the most reliable; we recall everything that has been written and declaimed against certain indications and certain conjecture; but above all these reasons, more or less sound, are law and jurisprudence. The Supreme Court has held that Law No. 11 of Toro does not require that the acknowledgment by the father shall be express, nor prior thereto did any other law so require, since Clause 7, Tit. XXII, Book IV of the Royal Ordinances has for its object in the method it sanctions, as shown by its own words, not the acknowledgment but the adoption of natural children, whether or not they be duly acknowledged as such (Judgment of October 8, 1855). In accordance with this judgment, it was held by another dated May 10, 1860, that the Laws of the *Partida* were not in point since the questions relating to acknowledgment of natural children must be decided according to Law 11 of Toro, that is No. 1, Title V, Book 10 of the New Recopilation.''

Likewise ''*puesto que*'' is defined as ''*aunque*'' in the dictionary of Salvat. It is our opinion, therefore, that the words ''*puesto que no haya tenido la mujer de quien lo ovo en su casa*,'' as expressed in the original Spanish, mean whether or not the father had possessed the woman in his house. In *Castro* v. *Solís*, 19 P. R. R. 645, we put this construction on the 11th law of Toro and we see no sufficient reason for changing our decision. Indeed the same party who was complainant in the case of *Castro* v. *Solís* began another complaint and a plea of *res adjudicata* was raised. The point was made in the second case that the question of prescription was not really decided in the first case, being *obiter dicta,* whereupon this court, reproducing the reasoning of the first case of *Castro* v. *Solís,* held that the action had nevertheless prescribed. 23 P. R. R. 485.

In the case of *Castro* v. *Solís* we said that an action of filiation was necessary even before the law of Toro cited. We feel bound to hold that in so far as the complainant bases her right on the public concubinage, she had no legal civil status and that with regard to any right she had by reason of the legislation in force before 1911 her action of filiation

has prescribed. On the 26th day of January, 1865, the Supreme Court of Spain decided a case wherein a child born of a concubine living in the house of the putative father brought a suit for filiation as a natural child. On cassation the appellant alleged that as this child was born of a concubine living in the house of the father no acknowledgment was necessary and that the suit therefore was a violation of the eleventh law of Toro and various cited laws of the *Partidas*. In other words, that only children born of a woman possessed outside of the father's house could be considered in the class of natural children who had a right to commence a suit for acknowledgment. The court decided that the 11th law of Toro was applicable to the facts at bar and that it was unnecessary to consider the cited laws of the *Partidas*.

The appellant, however, says her right is now perhaps for the first time set forth by the law of 1911. A statute is almost always forward looking unless a different intent prevails. The Legislature must be presumed not to have intended that children born before 1911 should fall within the provisions of that law. Generally we have held that the law to be applied is the law in force at the time of the birth of the child. See also the fourth transitory provision of the Civil Code as construed by us in *Gual* v. *Bonafoux*, 15 P. R. R. 545. The appellant's idea that she has had the continual status of a natural child apparently is based on the same assumption that no acknowledgment was necessary.

If we understand the appellant, she maintains that as the question before us arose by reason of a demurrer to a complaint and as therein she says she has the continued status of a natural child, this fact must be taken as true. But a demurrer only admits the truth of the facts well pleaded. The appellant must set out the facts that give her the status. Otherwise it is her conclusion of law. But in the complaint before us the facts of each count are interrelated with the

first count and therein the character of the status claimed is fully set forth as already considered by us.

We think it is clear that the defendants against whom this action was brought had a right to allege prescription even though they are collateral relatives. They succeeded to all the rights of the father of the complainant.

The judgment must be

*Affirmed.*

Chief Justice Del Toro and Justice Aldrey concurred.

Mr. Justice Hutchison concurred in the judgment.

Mr. Justice Franco Soto took no part in the decision of this case.